UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRISTOPHER D. COUSINO #310603,

    Plaintiff,

v.                                                                                     Case No. 2:15-cv-187
                                                                                     HON. GORDON J. QUIST

BIENVENIDO CANLAS, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Christopher D. Cousino, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Bienvenido Canlas, Jesus Neri, and Corizon Health, Inc. ("Corizon"). Corizon is a private company that provides health care to inmates within the Michigan Department of Corrections. Defendant Canlas is a medical doctor employed by Corizon, and Defendant Neri is a medical doctor formerly employed by Corizon. Plaintiff alleges that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Defendants have now filed a motion for summary judgment pursuant to Federal Rules of Civil Procedure 56. (ECF No. 56.) Plaintiff has responded. (ECF No. 60.) This matter is now read for decision.

Plaintiff's allegations arise from a series of events related to his medical treatment while incarcerated at Kinross Correctional Facility. On September 6, 2013, Plaintiff sent a health care request to treat "some kind of itchy fungus all over [his] body." PageID.890. In response to his health care request, Plaintiff was seen by Defendant Neri on September 13, 2013.

PageID.856.  Defendant Neri diagnosed Plaintiff with scabies and ordered him into medical quarantine.  PageID.854.  To treat the rash, Defendant Neri provided Plaintiff with "Rid shampoo," which is a lice killing shampoo.  PageID.856.  Defendant Neri also requested that all of Plaintiff's laundry and bedding be washed immediately.  PageID.855.

On September 17, 2013, Plaintiff complained that his rash was getting worse.  PageID.852.  Plaintiff was seen by a nurse on the same day.  PageID.853.  The nurse noted the Plaintiff still had the rash, but did not find any symptoms of scabies—such as "burrows" or dark areas on Plaintiff's skin.  PageID.853.  Plaintiff was instructed to continue the Rid shampoo treatment and to avoid scratching the rash.  PageID.853.  The following day, Plaintiff was seen by Defendant Canlas.  PageID.849.  During the examination, Defendant Canlas noticed Plaintiff had "papulous vesicular lesions and erythematous papules with excoriations."  PageID.850.  According to Defendant Canlas, these excoriations are commonly caused by scratching and itching.  PageID.694-695.  To reduce the swelling, itchiness, and redness, Defendant Canlas prescribed triamcinolone acetonide cream.  PageID.849.

Plaintiff was seen by Defendant Canlas for a follow-up appointment on September 24, 2013.  PageID.846.  After examining Plaintiff, Defendant Canlas determined the Rid Shampoo and triamcinolone acetonide cream were working because Plaintiff's rash was receding and the lesions were drying.  PageID.846.  Moreover, the medical records show that Plaintiff informed Defendant Canlas that he did not have any new lesions.  PageID.846.  Plaintiff was subsequently released from medical quarantine, and Defendant Canlas told Plaintiff to send a health care request if the treatment plan was not working.  PageID.846.

Plaintiff did not seek medical treatment again until November 7, 2013, when he complained that the itchy fungus all over his body was causing discomfort.  PageID.845.

Plaintiff was seen by a nurse on November 12, 2013.  PageID.844.  Plaintiff told the nurse that he had new "bites" and that he did not think the scabies ever went away.  PageID.844.  On November 13, 2013, Plaintiff was seen by Defendant Canlas.  PageID841-842.  Although Plaintiff's rash appeared worse, Defendant Canlas did not notice any evidence of scabies.  PageID.696.  Defendant Canlas prescribed betamethasone valerate ointment to reduce Plaintiff's redness, itching, and swelling.  PageID.841.  Plaintiff contends that when he went to pick up his prescription, he was only provided with half an ounce of the ointment.  PageID.12.  Defendant Canlas also prescribed Bactrim, an oral antibiotic to treat the infection.  PageID.841.

On November 27, 2013, Plaintiff requested to see a health care provider for his rash.  PageID.696.   After initially being denied, Plaintiff faked losing consciousness in order to see a medical provider.  PageID.832-833.  Plaintiff was then seen by Defendant Canlas.  PageID.835.  Plaintiff alleges that he showed Defendant Canlas some information that his mother sent him regarding the treatment of folliculitis. PageID.15.  Defendant Canlas did not prescribe the medications that Plaintiff requested.  PageID.15.  Instead, Defendant Canlas prescribed four bottles of triamcinolone acetonide ointment because it appeared to work the first time Plaintiff was prescribed this ointment.  PageID.696, 834.  Shortly thereafter, Plaintiff sent a health care kite complaining that the ointment was not working.  PageID.832.  Plaintiff also stated that he had folliculitis.  PageID.832.  Plaintiff was subsequently seen by a nurse on December 6, 2013.  PageID.830.  The nurse told Plaintiff that it would take more than three days for the ointment to start working.  PageID.830.

On December 12 and 13, 2013, Plaintiff sent health care kites complaining that he had folliculitis and that the triamcinolone acetonide ointment he was prescribed was making his rash worse.  PageID.828-829.  Plaintiff requested a different treatment plan.  PageID.829.  In

response, a nurse instructed Plaintiff to keep his skin dry and to use the ointment only on the infected areas. PageID.828. The nurse also set up an appointment with a medical provider for December 27, 2013. PageID.697. However, Plaintiff did not see a service provider on December 27, 2013 because the prison had an "emergency count." PageID.697.

Plaintiff was seen three days after his scheduled appointment, on December 30, 2013, by Defendant Neri. PageID.824. During this examination, Defendant Neri noted a "extensive maculo-papular eruption" and some secondary infections. PageID.824. In response, Defendant Neri discontinued Plaintiff's triamcinolone acetonide ointment prescription. PageID.823. To treat the secondary infection, Defendant Neri prescribed doxycycline hyclate. PageID.823. Defendant Neri also prescribed Zantac to reduce Plaintiff's itchiness. PageID.823. Plaintiff also was instructed to use a cotton blanket instead of a wool blanket because Defendant Neri determined that Plaintiff's reaction could be from an allergy to wool. PageID.825. Plaintiff alleges that he showed Defendant Neri the information his mother sent him regarding the treatment of folliculitis. PageID.23. Plaintiff further alleges that Defendant Neri did not follow that treatment plan because he would have to request approval for the non-formulary medications from the regional medical officer. PageID.23.

On January 7, 2014, Plaintiff again complained that the new treatment plan was not working. PageID.822. In response to his complaint, Plaintiff was seen by a nurse on January 9, 2014. PageID.819. The nurse scheduled an appointment for Plaintiff to see Defendant Neri on January 13, 2014. PageID.815. During this examination, Defendant Neri prescribed nystatin. PageID.814. Defendant Neri also discontinued Plaintiff's Zantac prescription because it did not appear to be helping. PageID.812. Defendant Neri attempted to prescribe Benadryl, which is a non-formulary medication that requires approval from the Kinross Correctional Facilities

-4-

Regional Medical Director.  PageID.7, 811.  However, the regional medical director denied Defendant Neri's request.  PageID.811.  Plaintiff was subsequently prescribed Claritin to control Plaintiff's itchiness.  PageID.811.

Even though Plaintiff had a different treatment plan, Plaintiff's rash continued to cause discomfort, and Plaintiff sent several more health care kites.  PageID.805-811.  Plaintiff was eventually seen by Defendant Neri on January 28, 2014.  PageID.801.  Defendant Neri discontinued the betamethasone and prescribed hydrocortisone, which is a different type of steroid cream.  PageID.801.  In addition, Defendant Neri again requested Benadryl, which was subsequently approved by the regional medical director.  PageID.800.

On February 5, 2014, Plaintiff requested to see a dermatologist.  PageID.791.  However, Plaintiff was told that he was going to see a medical provider to evaluate his condition.  PageID.791.  On the same day, Defendant Neri ordered skin cultures to check for fungus and scabies.  PageID.789.  On February 6, Plaintiff was seen by Physicians Assistant Timothy Benac.  PageID.786-787.  Benac determined that Plaintiff's rash was not improving despite the various treatment plans.  PageID.786.  Plaintiff was then prescribed Permethrin, an ointment that is commonly used to treat scabies or lice infestations.  PageID.699, 785.

On February 9, 2014, Plaintiff complained that his rash was worse.  PageID.782.  On February 10, 2014, Plaintiff complained his entire legs were covered with zits and bumps.  PageID.781.  The following day, Plaintiff was seen by a nurse.  PageID.778.  The nurse determined that Plaintiff was having an allergic reaction to the newly prescribed Permethrin.  PageID.778. According to Defendant Canlas, Permethrin is a "strong medication" that can cause allergic reactions on patients with sensitive skin.  PageID.699.  However, Defendant Canlas believed that prescribing this medication was within the standard of care because all other

medications were not working. PageID.699. Plaintiff was subsequently prescribed Medrol to treat his allergic reaction. PageID.775.

On February 12, 2014, Plaintiff's skin cultures came back negative for scabies. PageID.774. Over the next two weeks, Plaintiff continued to complain about his skin rash through health care kites. PageID.769-773. Specifically, Plaintiff stated that the rash was not going away and that he had several puss-filled lesions. PageID.772. On February 27, 2014, Plaintiff requested that he receive Pramoxine and Ivermectin, which were two medications that were outlined in the information his mother sent him. PageID.769. In response to this request, Plaintiff was seen by Benac on February 28, 2014. PageID.768. Benac noted that the Permethrin appeared to be the most successful treatment, but a second phase could not be prescribed because Plaintiff had an allergic reaction. PageID.768. Benac then prescribed Ivermectin and Pramoxine, and both were approved by the regional medical director. PageID.765-768. After several doses of these medications, Plaintiff's skin condition eventually cleared up.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient.  *Anderson*, 477 U.S. at 251-52.  Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Plaintiff asserts that Defendants Canlas and Neri were deliberately indifferent to his medical needs in violation of his Eighth Amendment rights.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."  *Blackmore*

*v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).  The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.*  Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.  *Estelle*, 429 U.S. at 105.  As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x. 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x. 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x. 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x. 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x. 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Assuming, without deciding, Plaintiff's skin condition is a sufficiently serious harm, Plaintiff has failed to show that Defendants Neri and Canlas acted with the requisite culpable state of mind to satisfy the subjective prong of the deliberately indifferent test. This is not a case where Plaintiff was denied medical care. To the contrary, Plaintiff received constant medical treatment between September 2013 and April 2014. He was seen by multiple nurses and medical providers, including Defendants Canlas and Neri. Moreover, Defendants Neri and Canlas attempted to treat Plaintiff's skin condition by prescribing several different medications and ointments.

Plaintiff contends that Defendants prescribed the wrong medications to treat his scabies. Defendants claim that even though Plaintiff was originally diagnosed with scabies, there was no evidence of scabies during later physical examinations. The medical records show that Plaintiff was diagnosed with scabies on September 7, 2013. However, Plaintiff did not seek medical treatment from September 24, 2013, to November 8, 2013. Thus, Defendants believed that Plaintiff's previous treatment was successful. Moreover, Nurses and medical providers did not notice any new burrows or dark areas on Plaintiff's skin, which are commonly evidence of scabies. Plaintiff was also clinically tested for scabies in February 2014, and the results came back negative.

In addition, Defendants prescribed medication that they thought would be effective. According to Defendant Canlas's Declaration, Zantac and Claritin are commonly used to treat itchiness resulting from allergic reactions, and Rid shampoo is commonly used to treat skin infections. PageID.694, 698. Moreover, Defendant Canlas states that Plaintiff's skin condition was a difficult case to treat because Plaintiff had sensitive skin that would have negative reactions to medications. PageID.703. Defendant Canlas also states that his decisions regarding how to treat Plaintiff were based solely on his medical judgment. PageID.704. Even if Defendants committed errors that rose to the level of medical malpractice or negligence, medical malpractice or negligence does not constitute a constitutional violation because "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (quoting *Estelle*, 429 U.S. at 106.)).

In addition, Plaintiff alleges that Corizon violated his Eighth Amendment rights. To prevail on a § 1983 claim against Corizon, Plaintiff "must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights.

*Braswell v. Corr. Corp. of Am.*, 419 F. App'x. 622, 627 (6th Cir. 2011). In this case, Plaintiff alleges that Corizon has a policy to deny medical treatment to inmates based on cost. Specifically, Plaintiff alleges that Corizon has two policies to lower costs: (1) a policy to discourage its staff from referring patients to outside medical practitioners; and (2) a policy to prescribe formulary drugs when non-formulary drugs are the most effective treatment. However, as discussed above, Plaintiff's Eighth Amendment rights were not violated; therefore, the "policy, practice, and custom" claim against Corizon must also fail. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

Moreover, Plaintiff's allegations against Corizon are conclusory. First, Plaintiff does not submit any evidence to support his allegation that Corizon has a policy to prescribe formulary drugs when non-formulary drugs are more effective. According to Defendant Canlas's Declaration, Corizon does not have any customs, policies, or procedures to deny inmates needed medical care. PageID.704. Second, Plaintiff cites *Davidson v. Corizon, Inc.*, 2015 WL 4173107 (N.D. Ala. July 10, 2015), in support that Corizon has a policy to deny referring inmates to specialists in an attempt to lower costs. In that case, the plaintiff submitted deposition testimony from a medical provider and Corizon's "Physicians in Corrections" handbook as exhibits. Here, Plaintiff does not submit any such exhibits to support his allegation. Moreover, Defendant Canlas states that there was no need to refer Plaintiff to a dermatologist because prison doctors are capable of treating skin conditions. This argument is supported by the fact that Plaintiff's skin condition was successfully treated without the need of a referral to a dermatologist. Therefore, Corizon is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motion for summary judgment. Accordingly, it is recommended that Defendants' motion for summary judgment (ECF No. 56) be granted and that this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $505 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505 appellate filing fee in one lump sum.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:      October 4, 2016                               */s/ Timothy P. Greeley*
                                                          TIMOTHY P. GREELEY
                                                          UNITED STATES MAGISTRATE JUDGE